**HYCOR CORPORATION, Plaintiff,**

v.

**The SCHLUETER COMPANY, Defendant.**

No. 81–C–176–C.

United States District Court, W.D. Wisconsin.

Feb. 25, 1983.

Daniel McEachran, Chicago, Ill., for plaintiff.

Robert E. Wagner, Chicago, Ill., for defendant.

## OPINION AND ORDER

CRABB, Chief Judge.

In this civil action for damages and injunctive relief, plaintiff is seeking an injunction against future infringement by defendant of U.S. Patent No. 3,876,548 (issued

to Donald P. Welles, Jr. on April 8, 1975 and thereafter assigned to plaintiff) and an accounting for damages for past infringement. Defendant defends on the grounds that plaintiff's patent is invalid, void, and unenforceable and not infringed by any product made or sold by it.

The patent at issue relates to a device for separating solids from liquids such as waste water, and sold by plaintiff as a "Roto-strainer." The novel feature of the patent device is claimed to lie in its solution to the common problem of clogging through the use of a structure that cleans itself. The device is designed and sold for use in such industries as food processing, tanning, pulp and paper, and petrochemical, and in municipal waste water treatment facilities as well.

Trial to the court has been held on the issues of validity and infringement. By order of the magistrate, determination of damages has been deferred to a subsequent proceeding.

From the evidence adduced at trial, I make the following findings of fact.

## FACTS

The Welles '548 patent discloses an apparatus for dewatering solids by using a rotating hollow cylindrical screen which acts as a strainer. The screen is mounted lengthwise to rotate continuously about its horizontal axis. Solids to be dewatered are fed from a head box onto one side of the exterior of the slowly rotating cylindrical screen strainer to permit water contained in the solids to pass through the outer surface of the screen and into the interior as a downwardly falling column and out of the bottom of the screen cylinder. The solids which are now dewatered remain on the screen exterior and are scraped from the screen surface by means of a wiper or "doctor" blade. The screen cylinder is self-cleaning, utilizing the downwardly cascading column of fluid to continuously flush out the screen bottom. The wipers assist in the cleaning function by cleaning the exterior of the screen; further cleaning assistance is provided by the combination of the radial force of the rotating screen, and the lead of the helix on the screen which moves the solids down to the end of the cylinder where they can be discharged conveniently.[1]

The claims of Welles '548 are drawn to a particular geometry and configuration of bars or wires having inwardly diverging sides, closely spaced to form the screen exterior or screening medium.[2] Specifically, claims 1–8 of Welles '548 claim in detail a wedge-shaped profile for the screen wires in which the total included angle formed between adjacent sides of two screen wires must be greater than about 14 degrees and less than about 90 degrees. Claims 2 and 5 further limit the invention of Wells '548 by claiming an included angle on the order of 26 degrees. Claims 3 and 9 limit the invention by claiming a separation or spacing between adjacent wedge-shaped wires on the order of .060 inches. Claims 4 and 9 limit the invention by requiring the diameter of the screen cylinder to be at least 11 inches. A final limitation on the wedge-shaped screen wire in Claims 1–8 is that the ratio of screen diameter to radial bar height be no less than 75. Claim 9 refers to a cylinder diameter of at least 11 inches but does not describe any limitations on the specific geometric configuration of the

---

1. The "lead of the helix" refers to the direction in which the cylindrical screen is wrapped; helix being, in geometric terms, a three-dimensional curve lying on a cylinder or cone, cutting the elements at a constant angle. The American Heritage Dictionary of the English Language, p. 612 (1970). A "Slinky" toy is a familiar example of a helical coil; another is a spring.

2. Throughout this opinion, I have followed the parties' practice of using the terms "wires" and "bars" interchangeably, to refer to the structural elements of the screening itself, as distinguished from the transverse rods that form the supports of the screen. The "wire" used for screening in the dewatering apparatus is many times heavier than the round wire used in such familiar household screen products as window screens or food strainers, and unlike the wire in those products, it is not woven. Thus, it is more descriptive to refer to it as a series of bars.

wedge-shaped screen wires for a cylindrical screen, saying only that

> the opposed sides of adjacent bars being at a predetermined angle great enough so that the spongy solids will not clog to any appreciable degree between the opposed faces or top and will clear when subjected to the impact of the cascading water at the bottom.

The patent application for Welles '548, Serial No. 435,163 was filed with the U.S. Patent and Trademark Office on January 21, 1974. Serial No. 435,163 was a continuation-in-part application of a co-pending application, Serial No. 294,076, filed on October 2, 1972 which itself was a continuation-in-part application of the original application, Serial No. 265,279, filed on June 22, 1972. As a continuation-in-part application, Serial No. 435,163 contained new subject matter not previously disclosed or claimed in the two prior Welles patent applications: (1) the included angle between adjacent bars in the screening medium is greater than about 14 degrees and less than about 90 degrees; (2) the cylindrical screen has a minimum diameter of at least 11 inches; (3) the ratio of screen diameter to radial bar height must be no less than about 75; and (4) the ratio or radial bar thickness to wedge wire face width is greater than 1 and less than 2.

In the continuation-in-part application, Welles added figures 12 and 13 to the patent drawings, together with the descriptive material relating to these drawings, which show the profile of the wedge wire. The patent drawing that is FIG. 12 is taken directly from the Johnson screen products catalog, to which I will refer later.

After the examiner initially rejected all claims of Serial No. 435,163, Welles and his patent attorneys were granted a personal interview with the patent examiner. After the interview, Welles responded to the outstanding first Office Action by amending his claims. He urged the allowance of these amended claims by arguing that the prior art cited by the examiner did not disclose the specific wedge wire configuration taught in the patent application and did not teach circumferential winding of wedge wire around the screen cylinder.[3] In addition, Welles submitted an affidavit which disclosed test data developed in 1972 relating to the alleged success of the newly introduced and claimed configuration for wedge shaped screen wire. Essentially, this affidavit suggested that wedge wire having a radial height of .100 inches and exterior face width of .060 inches and an included angle of 26 degrees was most successful in preventing clogging of the screen.

On the basis of the new submissions, a patent was issued to Welles. Thereafter, it was assigned to plaintiff, a corporation founded by Welles in 1970, of which he is president.

---

**3.** In Remarks that were part of this response, Welles's attorney stated in part:

> In accordance with the discussions developed at the interview, we enclose herewith an affidavit by the applicant, giving the results of certain tests performed some time back, and referred to on page 6, which clearly show that an included angle between the adjacent sides of two bars must be greater than about 14° and that the thickness, in a radial direction of the bar—which is expressed as a ratio to screen diameter in the specification and claims—is important, along with the included angle to prevent a unit of this type from blinding quite rapidly, thereby rendering it inefficient and impractical.
>
> We will not burden the record with an extensive discussion of the prior art, specifically Hawley 2,294,179, since we believe that the Examiner agreed that he did not disclose this concept and specifically does not dis-

close a screening medium of this type. He refers to round wire and flat wire set on edge, which would be disastrous for applicant's purpose. The parallel spaces between the opposed faces of flat wire would clog immediately. Round wire would present double funnels, both in and out, with the outer funnels augmenting the clogging tendency, rather than avoiding it.

> We agree that wedge wire as such is old, as in Cook 828,715, but the Examiner will note that the wedges run longitudinally, rather than circumferentially. So the gaps between the wedges will also be longitudinal and will tend to cut across the fluid stream, both on top and on the bottom. When the slots or spaces run parallel to the stream, a much more effective cascading action will be obtained, as will the impingement of the cascade upon the upwardly opening troughs at the bottom of the cylinder.

At the time Welles filed his application for patent '548, there were on record these patents, among others: U.S. Patent No. 2,294,179, Hawley; U.S. Patent No. 2,046,-458, Johnson; and U.S. Patent No. 2,084,-433, Chorlton. Also in existence was a manufacturer's catalog, entitled "Screen Products for Industry," (copyright 1967), published and distributed by the Johnson Screen Division of Universal Oil Products.

The Hawley '179 patent teaches all of the basic elements of a rotary screen strainer: the headbox, the rotating screen, the doctor blade, and the use of cascading water for cleaning, specifically, the self-cleaning of a rotating cylindrical straining screen by utilizing the column of water downwardly falling through the interior of the screen cylinder to flush out the bottom of the screen.[4]

Hawley does not teach the specific wedge wire configurations, the ratio of screen diameter to radial bar thickness, and the limitation of a screen having a diameter of at least 11 inches that the Welles '548 patent claims. The Hawley patent was cited by Welles in his application.

The Johnson '458 patent teaches the construction of a cylindrical screen having wedge-shaped wire wound in a continuous helical coil upon longitudinally arranged and spaced support rods and it describes the wedge wire used in the Welles '548 device. Johnson was not cited by Welles.

The Chorlton '433 patent discloses a dewatering device including a cylindrical screen formed of helically wound wedge-shaped wires. FIG. 8 of Chorlton '433 illustrates a cross-sectional view of a wedge-shaped screen wire similar to that illustrated as FIGS. 12 and 13 of the Welles '548 application. Chorlton was not cited by Welles.

The Johnson catalog teaches the identical geometric configurations for a continuously helically wound wedge-shaped screen wire as called for in the claims of Welles '548,

and the self-cleaning characteristics which are imparted by a cylindrical screen manufactured from wedge wire which serves to minimize the blinding or clogging of screen openings. From reading the Johnson catalog, a prospective customer would learn that Johnson screen products are designed for use in waste water treatment installations, in the food processing industry, and in other "dewatering" or straining applications. Also the customer would learn that the Johnson screens employed a continuous slot, or wedge wire, construction, rather than a round-hole or mesh design; that the wedge wire design decreased clogging or "blinding"; that the wedge wire configuration was adaptable to an outside to inside flow of liquid or to a reverse flow from inside to outside; and that the screens could be used in a rotating situation as well as in a fixed position.

Further, as an aid to the customer in choosing the most effective surface profile and support rod spacing for the particular installation, the Johnson catalog featured a chart plotting the relationship of spatial opening between adjacent wires to the open area on the screen surface. The chart shows that, at a spacing of .060 inches, the use of No. 60 wire will result in 50% of the screen's surface being open, while use of No. 69 wire with the same spacing will reduce the open area to about 47–48%. The catalog shows twelve different configurations of wedge wire, two of which have included angles of 26 degrees or greater (the No. 60 and the No. 90) and two of which show included angles of 18 degrees (the No. 69 and the No. 190). In reality, the included angle of the No. 69 wire is about 14 degrees; the 9 degree one-sided angle shown in the catalog is erroneous. In later editions of the catalog it has been revised to 7 degrees.

The catalog shows that Johnson screens could be fabricated as flat panels of any

---

4. Plaintiff argues that, because Hawley's main cleaning device is an airjet, the patent does not teach self-cleaning by water flow. That Hawley does not rely exclusively on cascading water for cleaning does not affect the finding that Hawley teaches the use of a rotating screen device in which a cleaning effect is achieved by having water cascading through the screen as it turns.

shape, or in conical or cylindrical shapes; it shows also that Johnson screens have been used as centrifuge baskets and as vertical spin driers.

Welles never advised the Patent Office of the Johnson catalog.

Welles first learned about Johnson wedge wire screens in 1971 from a welldigger who used a Johnson screen in a duck pond he built for Welles. The Johnson screen is used commonly in wells to prevent sand from coming up the casing after the well has been installed. Welles obtained a copy of the Johnson catalog and later built a prototype of the Rotostrainer experimenting with three Johnson wedge wire configurations: No. 60, No. 69, and No. 90.

The Johnson No. 69 wedge wire screen has a height of about .170 inches, a face width which forms the exterior surface of the screen cylinder of about .069 inches and an included angle defined between adjacent wedge wires of about 14 degrees. The Johnson No. 60 wedge wire screen has a height of about .100 inches, a face width of about .060 inches and included angle of about 26 degrees. The range of tolerance on such wire is on the order of .003. The Johnson No. 90 wedge wire screen has a height of about .370 inches, a face width of about .090 inches and included angle of about 26 degrees. (Welles made no extensive use of the No. 90 configuration.) After learning of the Johnson screen products, Welles never looked at any other screens for use in the Rotostrainer. Welles used only the standard configurations manufactured by Johnson. He never had any other configurations produced as custom orders.

Throughout 1972 and early 1973 plaintiff built rotary screen strainers using both No. 60 and No. 69 wedge wire screens. Two of these plaintiff installed at the North Chicago [Illinois] Sewage Treatment Plant in the summer of 1972; they remained there until October, 1974. One strainer had No. 60 wire; the other used No. 69.

Also in the summer of 1972, plaintiff shipped to Oscar Mayer & Co. in Beardstown, Illinois, a rotary screen strainer using a No. 69 wedge wire screen. In the fall of 1972, plaintiff shipped to Oscar Mayer & Co. in Madison, Wisconsin, a strainer having a No. 69 wedge wire screen. Oscar Mayer paid plaintiff rent for this machine of $100 per month.

Also in 1972 plaintiff shipped to the St. Paul Municipal Sewage Treatment Plant a strainer having a No. 69 wedge wire screen. In the same year, plaintiff sent Iowa Beef Processors one of plaintiff's strainers having a cylindrical screen made from No. 60 wire and a second screen manufactured from No. 69 wire. Also in 1972, plaintiff sent E. Kahn & Sons in Cincinnati, Ohio, one of plaintiff's strainers having a cylindrical screen made of No. 60 wire. Finally, in 1972, plaintiff delivered a strainer to Perk Foods, Chicago, Illinois, which had a No. 69 wedge wire screen.

In order to determine the effectiveness of plaintiff's strainer in a commercial setting, no more than four to five days of testing is required.

Plaintiff imposed no obligation of secrecy on any of the employees at the North Chicago Sewage Treatment Plant regarding the use or testing of plaintiff's Rotostrainers at the plant. The employees of the North Chicago Sewage Treatment Plant and visitors had access to plaintiff's rotary screen strainers and were free to disclose to anyone their knowledge of plaintiff's strainers.

The employees at the Oscar Mayer & Co. plant in Beardstown were under no obligation not to disclose information about the Rotostrainer having No. 69 wire being used at this plant.

Plaintiff displayed photographs of its rotary screen strainers at the North Chicago Sewage Treatment Plant to an employee of Oscar Mayer & Co. with the intention that Oscar Mayer & Co. would purchase one of plaintiff's rotary screen strainers. Plaintiff also forwarded copies of these photographs of the North Chicago Sewage Treatment Plant rotary strainers to Packerland Packing Co. of Green Bay, Wisconsin, in August, 1972, as part of plaintiff's efforts to sell to

Packerland one of plaintiff's rotary screen strainers.

The 1972 and early 1973 use of plaintiff's Rotostrainer by sewage treatment plants and food processors was intended to develop commercial demand for the Rotostrainer and to exploit its commercial value.

Plaintiff did no side-by-side testing of machines using the No. 60 wire against machines using the No. 69 wire except at the North Chicago Sewage Treatment Plant installation where in 1972 plaintiff tested both wedge wire configurations in controlled tests using the same weir box for each, the same pressure head, the same peripheral speed, and the same effluent.[5] The results of these tests demonstrated that the No. 60 wedge wire outperformed the No. 69.

In 1976, Clarence Fishleigh, an independent consulting engineer, conducted a test at the North Chicago Sewage Treatment Plant of two Rotostrainers, one equipped with a No. 60 wedge wire screen, the other with a No. 69 wedge wire screen. Fishleigh found that the No. 69 wire tended to clog more rapidly than the No. 60 and that, in the case of the No. 60, there was no appreciable clogging over the full three-day period of the testing. Fishleigh had no experience or specialized knowledge in the straining of sewage.

In 1973 plaintiff shipped a Rotostrainer having No. 60 wire to Sioux City Stockyards. The purchase order for this machine was dated January 19, 1973.

More than one year prior to January 21, 1974, the date on which Welles filed his application for patent '548, plaintiff had placed on sale for commercial purposes a rotary screen strainer embodying all of the features of the nine claims of the Welles '548 patent.

The prior art relevant to the Welles '548 patent is U.S. Patent No. 2,294,179, Hawley; the 1967 Johnson catalog; U.S. Patent No. 2,046,458, Johnson; U.S. Patent No. 2,084,443, Chorlton, and the rotary screen strainer put on sale by plaintiff in 1972. Welles did not disclose to the patent office that rotary screen strainers had been on sale more than one year prior to his patent application.

The combination of Hawley and the Johnson catalog or Chorlton and the Johnson catalog disclose all of the structural elements of the claims in Welles '548. The Johnson catalog teaches the specific included angles found as a claim limitation in claims 1–8, describes in detail the self-cleaning characteristics of wedge wire screen, and suggests the bar separation of claims 3 and 6. The combination of Hawley and the Johnson catalog or the patents to Johnson, or Chorlton and the Johnson catalog teach all of the material elements found in claims 1–9 of Welles '548.

The only limitations not specifically taught or disclosed in the prior art are the ratio of screen diameter to radial bar thickness being no less than about 75, which is contained in claims 1 and 4 and the claim

---

5. Although at trial plaintiff testified that he did no controlled side-by-side testing until the spring of 1973, he swore before the patent office that he had done that testing in 1972. It seems likely that plaintiff's memory was more precise when he executed the affidavit for the patent office in October, 1974, than when he testified in 1982, both because less time had passed since the testing and because he had the opportunity to check his records thoroughly before making the averment.

Also, the averment in the affidavit is consistent with his statements to one Keith Larson of the South St. Paul Sewage Treatment Plant in a letter dated January 10, 1973. In that letter, Welles wrote

Our findings at North Chicago roughly confirm your findings at St. Paul on the # 69

profile wire in that we appear to get some blinding over time in sanitary sewage, whereas with the # 60 profile wire we were able to run 40 days without any change in flow rate and without cleaning.

At trial, Welles testified that the affidavit was not inconsistent with his trial testimony that the North Chicago tests were not conducted until the spring of 1973, because the affidavit did not state exactly when the tests were conducted. I found Welles's testimony unpersuasive on this point; the affidavit states plainly that the tests were conducted in 1972. Paragraph two begins: "In 1972 we obtained and tested a unit. . . ." There is no reference to any other date and nothing to suggest that the testing extended into the following year.

limitation found in claims 4–9 requiring that the screen cylinder have a diameter of at least 11 inches. None of these limitations appear to be critical to the effective operation of a rotary screen strainer. They represent nothing more than mechanical skill or design choice. Moreover, these limitations are inherent in all 60 wire screens over 11 inches in diameter which are ordered from the Johnson catalog by plaintiff, defendant, or anyone else.[6]

The subject matter of Welles '548 and of the prior art is readily understandable.

Plaintiff knew or should have known of the high degree of relevance of the Johnson catalog and its own on-sale activities as prior art. When plaintiff filed this lawsuit, it was aware of the possible invalidity of its patent and of the legal consequences of asserting such a patent.

## OPINION

Defendant attacks the validity of the Welles '548 patent on four grounds: (1) the claimed subject matter was obvious; (2) the device was publicly used or on sale more than one year prior to the date of filing of the patent application; (3) the patent specification did not comply with the requirements of 35 U.S.C. § 112; and (4) plaintiff's failure to disclose relevant prior art known to it amounts to fraud on the patent office.

Jurisdiction is present. 28 U.S.C. § 1338(a).

### 1. Obviousness

Although plaintiff contends that the invention of the Rotostrainer was not obvious, both because of the particular and unique combination of elements and because of its use of the No. 60 wedge wire which produced unexpected results, significantly better than with the No. 69 wedge wire, ultimately its argument comes down to just the difference between the No. 60 and the No. 69 wire. Indeed, plaintiff concedes in its post-trial reply brief that if the Welles and Fishleigh tests do not establish

an unexpectably patentable difference between the two wires, the court should hold the '548 patent invalid.

Since I find that the results of those tests establish that the use of the No. 60 produces a result that is superior, but not so unexpected as to be patentable, I am prepared to find the patent invalid.

The elements of the Rotostrainer were all well known in the prior art. The only advance that Welles made was the choice of the best Johnson wedge wire configuration to keep the screen from clogging.

It is not the fact the device is made of old elements that disqualifies the Rotostrainer from patent protection, because most inventions are made up of known elements, *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963 (7th Cir.1979), but the fact that the invention as a whole would have been obvious.

In the Rotostrainer, the doctor blade, the cascading water, the rotating cylindrical screen, and the headbox all perform the same functions they were claimed to perform in the Hawley '179 patent. The helically-coiled wedge wire screen performs the same self-cleaning function claimed by the Johnson '458 patent. Even the No. 60 wedge wire which is now asserted as the single novel aspect of the Welles patent, performed the same function it was designed to perform: the prevention of blinding. The fact that the No. 60 wire performed with markedly more efficiency than did the No. 69 wire does not make the device patentable. It was to be expected that one configuration would perform significantly better than another, depending upon the application, use, and installation; that is the reason Johnson manufactures screens in more than one profile.

In *Brunswick Corp. v. Champion Spark Plug Co.,* 689 F.2d 740, 750 (7th Cir.1982), the Court of Appeals for the Seventh Circuit noted,

---

**6.** The Patent Office Board of Appeals made the same finding. In its decision affirming the Examiner's rejection of Welles's divisional appli- cation Serial No. 642,536, the Board found that these limitations were "matters of obvious design."

Superiority and nonobviousness ... are not synonymous, although superiority may in some instances be evidence of invention ... The mere substitution of one—albeit superior—material for another in an existing product or structure is ordinarily deemed to be obvious. *Centsable Products, Inc. v. Lemelson,* 591 F.2d 400 (7th Cir.) *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1980).

Once Welles had been introduced to Johnson wedge wire screens and had obtained a copy of the Johnson catalog, all he had to do, and all he did do, was to try some of the various sizes and configurations of wedge wire manufactured by Johnson to see which ones were strong enough to retain the cylindrical shape he wanted and which ones were most resistive to clogging. The choice was a limited one: the catalog showed only twelve difference surface profiles. Welles was not working with a universe of all the possible configurations of wedge wire screen profiles; he was working only with three of the twelve shown in the Johnson catalog. He never custom-ordered any other wedge wire configurations; in fact, he never even looked at any wedge wire screen products other than Johnson's.

■ Plaintiff concedes that it was obvious for Welles to try the other configurations of the Johnson wedge wire, but argues that "obvious-to-try" is not the test, citing *Novo Industri A/S v. Travenol Laboratories, Inc.,* 677 F.2d 1202, 1208 (7th Cir.1982). Plaintiff is correct, but there is a corollary: the test of obviousness is whether the invention as a whole would be obvious, including the nature of the results obtained. *Id.* As a whole, the Rotostrainer is obvious. There is nothing patentable in the fact that neither Welles nor Fishleigh anticipated the significantly better results; the results were not so different from what would be expected as to render them nonobvious.

■ Despite the presumption of validity that the Welles '548 patent carries, I am prepared to find that defendant has overcome that presumption in showing the obviousness of the patented device by clear and convincing evidence. The prior art discloses all of the essential elements of the device and there is no novel or ingenious difference in the way the known elements are combined or used in the device and, in particular, there is nothing inventive about the use of the No. 60 wire. There is nothing about the invention as a whole that is not obvious.

There is no need to make a finding as to the level of ordinary skill in the art because the subject matter of the Welles '548 patent and the prior art is easily understandable. *Medical Laboratory Automation, Inc. v. Labcon, Inc.,* 670 F.2d 671 (7th Cir.1981); *Harvestall Industries Inc. v. Hochstetler,* 656 F.2d 1232 (7th Cir.1981).

I make the finding that defendant has overcome the presumption of validity attaching to a patent without relying upon Welles's failure to submit to the patent office all of the relevant prior art. *See* discussion at part 3, *infra,* which of course destroys the customary presumption of validity. *Armour and Co. v. Swift & Co.,* 466 F.2d 767 (7th Cir.1972).

Because I conclude that the Welles invention is obvious, there is no need to discuss in any detail the secondary considerations such as commercial success, prior unsuccessful efforts to meet a long-perceived need, etc., which are relevant only in close cases where there is some room for doubt about the obviousness of the invention. *Brunswick Corp. v. Champion Spark Plug Co.,* 689 F.2d at 751; *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963.

## 2. On-Sale Activities

■ The Welles '548 is invalid on the ground of obviousness; it is also invalid because the invention was on sale more than one year before Welles filed the patent application. Under 35 U.S.C. § 102(b), such on-sale activities preclude the granting of a patent, unless the inventor can prove by clear and convincing evidence that the public sales or use were part of a good faith program of experimentation. *In re Theis,* 204 U.S.P.Q. 188 (C.C.P.A.1979); *Amphenol Corp. v. General Time Corp.,* 397 F.2d 431,

433 (7th Cir.1968). In this case, plaintiff made no such showing, relying perhaps on its position that the sales and promotion of the Rotostrainer using No. 69 wire were irrelevant, because of the allegedly significant and patentable difference between the use of the No. 69 and the use of the No. 60 wire. Even if there were such a difference, plaintiff installed three No. 60 devices during 1972, at Kahn, at Iowa Beef, and at North Chicago, and offered and signed a purchase order for a No. 60 Rotostrainer more than one year before Welles filed his application.[7] Plaintiff attempts to avoid the force of this evidence by contending that at the time the purchase order was signed, it had not yet reached the conclusion that the No. 60 wire was better than the No. 69. The contention is untenable in view of Welles's averment in his affidavit and his letter to Larson at the South St. Paul Sewage Treatment Plant, *see* n. 6, *supra.*

> For § 102(b) to apply, it is not necessary that a sale be consummated. It suffices that the claimed invention, reduced to practice, was placed on sale, *i.e.,* offered to potential customers, prior to the critical date.

*In re Theis,* 204 U.S.P.Q. at 192. At the time of the sale to Sioux City, plaintiff had working models of the Rotostrainer *and* the knowledge that the No. 60 wire was superior. No more is required to show that the invention was capable of being sold, and, since even a single, unrestricted sale is a bar to patentability, *Consolidated Fruit-Jar Co. v. Wright,* 94 U.S. 92, 94, 24 L.Ed. 68 (1876), plaintiff's January 19, 1973, unrestricted sale of the No. 60 Rotostrainer to Sioux City would render its patent invalid, even if plaintiff were able to show that all of the other installations were experimental.

Although plaintiff contends that all of the promotion, rentals, and sales of its Rotostrainers in 1972 and early 1973 were experimental, the contention is unconvincing in light of the absence of test reports (except at North Chicago), the displays of photographs to prospective customers, the absence of any precautions to preserve the secrecy of the so-called testing and of the invention itself, the multiple installations in closely-related industries, the evidence that four to five days is sufficient for testing, the charging of a rental fee, and the lack of any side-by-side testing anywhere other than at North Chicago. I find and conclude that plaintiff has not met its burden of showing by clear and convincing evidence the exclusively experimental nature of its public use of No. 60 and No. 69 Rotostrainers in 1972 and early 1973.

### 3. Lack of Candor

Welles and his patent counsel had an affirmative obligation to disclose all information material to the examiner of the Welles '548 patent. The Johnson catalog was the most relevant information they

---

7. Defendant argues that because claim 9 of the patent includes no limitation on the specific geometric configuration of the wedge wire, the 1972 sales of the No. 69 Rotostrainer invalidate this claim of the patent regardless of whether there is a patentable difference in the use of the No. 60 wire or whether there was an early January, 1973, sale of a No. 60 Rotostrainer. In opposition, plaintiff contends that in referring to "a predetermined angle great enough so that the spongy solids will not clog to any appreciable extent between the opposed faces on top," it is clear that claim 9 is limited to an angle greater than about 14 degrees, since the whole thrust of the patent specification is to the effect that a minimum included angle greater than about 14 degrees is required before the device will perform its intended purpose satisfactorily.

Because I find that the invention as a whole is obvious and the patent invalid, I see no need to resolve this dispute which goes to only one claim. I see no need either to discuss at any length the curious aspect of the "greater than about 14° included angle" limitation contained in the patent. It is not clear why, if the No. 60 wire which had the 26° angle was so far superior to the No. 69 with the 14° angle, Welles did not simply refer to the 26° angle. Given the tolerance in production, some No. 69 wire will exceed the 14° angle specification, which seems to undercut plaintiff's argument that the one significant, patentable element of the Rotostrainer is the use of the No. 60 wire in preference to the No. 69.

could have submitted in connection with their assertion that the patentable aspect of the Rotostrainer was Welles's discovery that a machine with a screen having wire with an included angle of 26° would outperform significantly the same machine with screen wire having an included angle of 14°.

As should be evident from the earlier discussion of obviousness, the examiner would have found it highly relevant to know that in choosing the most effective configuration of wedge wire Welles was working from a universe of two or three possibilities, culled from a group of twelve, all of which were standard manufactured items. The examiner would have found it relevant as well to see that the "source" referred to by Welles in his affidavit manufactured and sold the screens as self-cleaning and that the screens could be ordered in cylindrical shapes and installed to rotate, and that the screens were adaptable to a reverse flow of liquid.

Plaintiff does not contest very strongly defendant's assertion of lack of candor, but relies again on its position that it is the unexpected difference in results that makes the No. 60 Rotostrainer patentable and that the key factor in obtaining the patent was the affidavit explaining test results. Plaintiff argues that the Johnson catalog would not have influenced the examiner's decision because it would have shown only that there were a number of wedge wire configurations, not which ones would work best for Welles's purposes. The argument is singularly unpersuasive; indeed, it is disingenuous in the light of the careful reference in Welles's affidavit to "our source" rather than to Johnson, and the omission of any reference to Johnson anywhere in the patent. If the Johnson source were so unimportant to the examiner's evaluation, Welles had no reason not to mention it.

Welles and his counsel also had a duty to cite the use and sales of Rotostrainers in 1972 and in early 1973. Even if plaintiff were correct in its assertion that the unexpected difference in result between the No. 69 and the No. 60 machine makes reference to the No. 69 machine irrelevant, the 1972 and early 1973 installations and sales of the No. 60 machine are highly material to the decision to issue a patent. The examiner would have found the commercial exploitation of the Rotostrainers relevant to the determination of the differences between the prior art and the invention as well as to the question whether a patent could issue in view of the public use more than one year prior to the filing of the patent application.

I find and conclude that Welles and his patent counsel did breach their duty of candor to the patent office; that the information withheld (the Johnson catalog and the 1972 and early 1973 installations and sale of the No. 60 Rotostrainer) would have been considered important by a competent patent examiner in deciding whether to issue a patent on the Rotostrainer; and that Welles's breach of his affirmative duty to bring the withheld information to the attention of the examiner destroys any presumption of validity to which the patent would otherwise be entitled and renders the Welles '548 patent unenforceable.

### 4. *Fraud on the Patent Office*

 Welles's failure to inform the patent office of the Johnson catalog and of the sales and public uses of the Rotostrainer amount to a fraud on the patent office. The omitted information was material and its omission could only have been the result of gross negligence or intent. *See Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885 (10th Cir.1979) (the two elements of patent fraud are materiality and intent or gross negligence). Materiality requires a finding that the examiner would have rejected the claims had he or she known all of the facts. *Id.; Waterman-Bic Pen Corp. v. W.A. Sheaffer Pen Co., Div. of Textron, Inc.,* 267 F.Supp. 849, 854 (D.Del.1967).

The Welles '548 patent would not have issued had Welles disclosed the Johnson catalog. No other conclusion can be reached from a review of the "Remarks" by Welles's patent counsel to the patent office, in which

counsel refers to the important differences between the Welles application and the Hawley '179 patent (counsel notes that Hawley does not disclose a screening medium of the type specified by Welles, but fails to note that both Johnson '458 and the Johnson catalog would disclose such a screening medium) and the differences between the wedge wire described in the Cook 828,715 patent and that specified by Welles (counsel points out that in Welles's application, the wedges run circumferentially rather than longitudinally as in Cook's patent; again, there is no reference to either the Johnson patent or catalog, both of which show circumferential winding of wedge wire). Had the Johnson catalog been cited, the examiner would have realized not only that the wedge wire configuration used by Welles was prior art, but that it was obvious for Welles or anyone else to try more than one of the Johnson configurations to obtain a better cleaning effect than Hawley had been able to achieve.

The intent requisite to a finding of fraud can be inferred from the failure of Welles or his patent counsel to cite the Johnson catalog or to advise the patent office of the source of the wedge wire screens (or the source of the drawings used for figure 12 of the continuation-in-part application).

> [Where] "the applicant or counsel knew or clearly should have known of the relevance of [the] prior art," the necessary element of wrongfulness, willfulness or bad faith will exist ... This element also "can be imputed from the facts existent or where relevant prior art is withheld through recklessness or gross negligence on the part of applicant or counsel."

*USM Corp. v. SPS Technologies, Inc.*, 514 F.Supp. 213, 236 (N.D.Ill.1981), *quoting In re Altenpohl*, 198 U.S.P.Q. 289, 319 (Comr. Pts.1976).

There can be no question that Welles and his counsel knew the relevance of the Johnson catalog. The inclusion of figure 12 in the application is enough by itself to estab-lish such knowledge, even without Welles's testimony of his exclusive reliance upon the Johnson screens in the development of his device.

Nor, I think, can there be any question of Welles's intent to withhold the information from the patent office. The careful omission of any reference to Johnson and the misleading nature of the "Remarks" submitted to the patent office allow no other conclusion.

Although the failure to cite the Johnson catalog is the clearest evidence of fraud, the failure to advise the patent office of the 1972 and 1973 early sales and installations of the Rotostrainer would lead to the same finding. The information was material, in that the examiner would not have issued the patent had the information been made known and Welles's failure to make it known can be deemed deliberate since it was information peculiarly within his knowledge. *See, e.g., CTS Corp. v. Piher Intern. Corp.*, 527 F.2d 95, 99–100 (7th Cir. 1975):

> We must assume that the applicant deliberately decided not to call the Examiner's attention to '478, since it was one of its own patents, and we are unwilling to assume that the Examiner was familiar with it.

I find and conclude that Welles's failure to cite the Johnson catalog and the public use of the Rotostrainer prior to January 21, 1973, was material and intentional and constitutes fraud on the patent office, rendering invalid the Welles '548 patent.

### 5. Infringement

Having found that the Welles '548 patent is invalid, I do not reach the allegations of infringement made by plaintiff. An invalid patent cannot be infringed.

### 6. Attorney's Fees

In patent cases, attorney's fees are to be awarded to a prevailing party only

upon an "unambiguous showing of extraordinary misconduct." *Airtex Corp. v. Shelley Radiant Ceiling Co.,* 536 F.2d 145, 155 (7th Cir.1976). "An award of attorney's fees focuses upon misconduct in the prosecution or defense of the patent claim, such as fraud on the patent office or the initiation of suit with unconfirmed data to support infringement," *Novo Industri A/S,* 677 F.2d at 1211, citing *Loctite Corp. v. Fel-Pro, Inc.,* 667 F.2d 577, 584 (7th Cir.1981).

█ In this case Welles committed fraud on the patent office. It follows ineluctably from this finding and from the fact that Welles is the president of plaintiff that when plaintiff commenced the suit against defendant it had good reason to know that its patent was probably invalid and, therefore, not subject to infringement. In these circumstances defendant is entitled to an award of reasonable attorney's fees. *American Can Co. v. Crown Cork & Seal Co., Inc.,* 693 F.2d 653 (7th Cir.1982), *Scheller-Globe Corp. v. Milsco Mfg. Co.,* 636 F.2d 177 (7th Cir.1980).

## ORDER

IT IS ORDERED that the Welles patent 3,876,548 is declared void and unenforceable. Judgment is to be entered in favor of defendant.

Defendant may have until March 7, 1983, in which to serve and file a verified petition for attorney's fees and costs. Plaintiff may have until March 28, 1983, in which to serve and file objections to defendant's petition.