**HYCOR CORPORATION, Appellant,**

**v.**

**The SCHLUETER COMPANY, Appellee.**

**Appeal No. 83–935.**

United States Court of Appeals,
Federal Circuit.

July 2, 1984.

Granger Cook, Jr., Chicago, Ill., argued for appellant. With him on the brief was Edward D. Manzo, Chicago, Ill.

Robert E. Wagner, Chicago, Ill., argued for appellee. With him on the brief were Robert E. Browne and Alan L. Barry, Chicago, Ill.

David J. MacDougall, Janesville, Wis., of counsel.

Before BALDWIN and MILLER, Circuit Judges, and KELLAM, Senior District Judge.[*]

BALDWIN, Circuit Judge.

This appeal is from the February 25, 1983 judgment of the United States District Court for the Western District of Wisconsin,[1] sitting without a jury, holding appellant Hycor Corporation's (Hycor) U.S. Patent No. 3,876,548 ('548), issued April 8, 1975, entitled "Screening Method and Apparatus," invalid under 35 U.S.C. § 103 for obviousness and 35 U.S.C. § 102(b) for being on sale and in public use more than one year prior to the filing date of the application for the subject patent. The trial court also held the patent invalid because it found that the patentee, Welles, and his patent counsel breached their duty of candor to the Patent and Trademark Office (PTO) by failing to cite relevant prior art and failing to disclose the uses and sales of Rotostrainers[2] made more than one year prior to the filing date of the application. Further, the court held the lack of candor amounted to fraud in the PTO. Attorney fees were awarded to appellee, The Schlueter Company (Schlueter), pursuant to 35 U.S.C. § 285. The trial court did not reach the issue of infringement. Hycor appeals from the invalidity determination and the attorney fees award.

We *affirm* the trial court's decision invalidating claims 1–9 of the '548 patent on the basis that the claimed invention was in public use more than one year prior to the filing date of the application. We *reverse* the trial court's decision to award attorney fees.

*Background*

Hycor owns the '548 patent which issued to Donald P. Welles, Jr., the president of Hycor.

The '548 patent describes and claims an apparatus for separating solids from liquids such as waste water. The apparatus incorporating the claimed invention is self-cleaning, and is more fully described below. Figs. 10, 12, and 13 of the patent are here reproduced:

FIG.10.

FIG.12

FIG.13.

---

[*] The Honorable Richard B. Kellam, Senior District Judge, United States District Court, Eastern District of Virginia, sitting by designation.

1. 564 F.Supp. 996, 219 USPQ 651 (1983).

2. The Rotostrainer is the device which embodies the invention of the '548 patent.

**1532**

Included in the device are a headbox 90 (Fig. 10) which receives the mixture to be separated via a pipe 92. A cylindrical screen 80 is positioned adjacent to the headbox, extending the length of the headbox; the screen rotates slowly via a motor. The mixture in the headbox is deposited onto the screen so that, as the screen turns, liquid falls through the screen while the solids are carried onto a platform 100. A wiper (doctor blade) 98 has an edge bearing against the surface of the screen which cleans the exterior of the screen as it rotates. The free-falling liquid which passes through the interior of the screen cleans the screen as it passes through the screen bottom.

The screen is made up of parallel bars (Figs. 12, 13) that have a wedge-shaped cross section. The bars are attached to a support structure so that they are perpendicular to the axis of the screen. An important feature of the invention is the particular geometry and configuration of bars or wires[3] having inwardly diverging sides and which are closely spaced to form the screen exterior or screening medium. As described in the patent:

The angle *(a)* formed by the inwardly-tapering sides 146 and a line generally perpendicular to the outer surface *W*, should be greater than about 7°, and less than 45°. It has been determined that when this angle is less than about 7°, there tends to be a packing of solid spongy material which has passed through the outer openings between bars. On the other hand, when the angle is greater than about 7°, the spongy material does not pack, but tends to be forced by the water through the screen, leaving free unblinded openings for the filtering and screening of the liquid-solid mixture. If the angle becomes too great, i.e., above about 45°, the screen itself is sufficiently weakened because of the cross sectional shape of the bars, that the unit has a tendency to have reduced life. Accordingly, these limits are important and screens formed with bar relationships

outside of these limits will not satisfactorily perform their intended purpose.

Also important is the relationship between the diameter of the screen and the thickness of the bars (H) (Fig. 12).

In like manner, the relationship of the diameter of the screen and the ratio of screen diameter to the thickness of each of the bars 142 or the distance *H* is important. It has been determined that the ratio of screen diameter to H must be greater than about 75 in order to have a sufficiently large screen to provide the cascading free fall of water to self-clean the spaces between the bars as the screen rotates.

All nine of the '548 patent's claims are in issue. Claims 1–3, paragraphing by us, are illustrative:

1. In a device for separating and dewatering the generally spongy solids from the liquid in sanitary sewage, food processing, meat packing and the like, including

a cylindrical screen having a screening medium about its outer periphery made up of spaced circumferentially arranged, generally parallel bars surrounding a generally open interior,

means supporting the screening medium for rotation about a generally horizontal axis so that the surface of the screening medium is rising on one side and descending on the other,

means for rotating the screening medium,

a headbox containing a liquid-solid medium to be separated directly adjacent the surface of the screening medium and opening against the rising side thereof above a horizontal plane through its axis,

a solids discharge adjacent the outer surface of the screening medium and spaced from the headbox in the direction of its rotation and beyond a vertical plane through its axis,

**3.** Throughout this opinion the terms "wires" or "bars" are used interchangeably to refer to the structural elements of the screening itself, as

distinguished from the transverse rods that form the supports of the screen.

movement of the screening medium carrying the separated solids from the headbox toward the solids discharge with the majority of the liquid passing through the screening medium at the headbox and falling freely in a cascading column down to the bottom area of the screening medium toward the inner surface of the medium primarily in an area on the rising side below the horizontal plane through its axis, the bars that make up the screening medium each having a generally flat outer face which, as a group, make up a cylindrical, generally smooth exterior surface with limited openings between adjacent bars to effect maximum separation adjacent the headbox followed by transportation of the separated solids to the solids discharge, the bars having inwardly diverging sides which define upwardly opening cleaning troughs at the bottom of the cascading column, the side of one bar defining an included angle with the opposed side of an adjacent bar greater than about 14° and less than about 90°, with ratio of screen diameter to radial bar thickness being no less than about 75.

2. The structure of claim 1 further characterized in that the included angle between the opposed sides of adjacent bars is on the order of 26°.

3. The structure of claim 1 further characterized in that the separation of the bars is on the order of 0.060 inches.

The patent application for Welles '548, Serial No. 435,163, was filed with the PTO on January 21, 1974 as a continuation-in-part application because it contained new subject matter that was not previously disclosed or claimed in two prior Welles applications. The application also contained new Figs. 12 and 13 which showed the profile of the wedge wires and descriptions of the figures. Fig. 12 was taken directly from the 1967 catalog entitled, "Screen Products for Industry," published and distributed by the Johnson Screen Division of Universal Oil Products (Johnson catalog), discussed more extensively below.

The examiner initially rejected all the claims of Serial No. 435,163, and Welles and his patent attorneys were granted a personal interview with the examiner. Welles then responded to the outstanding first office action by amending his claims. In the amendment Welles agreed that U.S. Patent No. 2,294,179 to Hawley (Hawley '179) teaches the general rotary strainer structure and that U.S. Patent No. 828,715 to Cook (Cook '715) teaches wedge wire in a cylindrical strainer, but argued that none of the prior art overcame the blinding (clogging) problem by use of only a rotary screen having wedge wire within a critical range of values.

Welles also submitted an affidavit which disclosed 1972 test data relating to the alleged success of the newly introduced and claimed configuration for wedge-shaped screen wire. The affidavit suggested that wedge wire having a radial height of 0.100 inches and an exterior face width of 0.060 inches and an included angle of 26 degrees (Johnson No. 60 wire)[4] was most successful in preventing clogging of the screen. In a side-by-side test, one Rotostrainer using a Johnson No. 60 wire screen

---

4. The Johnson catalog has a pictorial representation (below) of the surface profiles of the twelve different wedge wires it manufactures. Of the twelve configurations, the trial court found Welles experimented with three: No. 60, No. 69, and No. 90.

| Wire | Face width | Angle | Radial height |
|---|---|---|---|
| No 40 | 040 | 13° | 078 |
| No 45 | 045 | 8° | 124 |
| No 60 | 060 | 13° | 100 |
| No.69 | 069 | 9° | 172 |
| No.69 A | 069 | 3° | 160 |
| No.90 | 090 | 13° | 140 |
| No.90 A | 090 | 5° | 140 |
| No.120 | 120 | 16° | 150 |
| No 130 | 130 | 8° | 255 |
| No 158 | 158 | 8° | 225 |
| No.190 | 190 | 9° | 370 |
| No.190 A | 190 | 2° | 370 |

cylinder (within the scope of the claims) and the other Rotostrainer using a Johnson No. 69 wire screen cylinder (outside the scope of the claims) were compared. The Rotostrainer having No. 69 wire lost 35–40% of its original capacity to filter material, while the Rotostrainer having No. 60 wire had not changed its capacity to filter material. In the affidavit, Hycor did not reveal that its source of wire screen cylinders was Johnson, but did mention a "source." The claims were allowed as amended.

### Issues on Appeal

1. Whether the trial court erred in holding the patent in suit invalid.

2. Whether the trial court abused its discretion in awarding attorney fees under 35 U.S.C. § 285.

### OPINION

*Validity*

Hycor appeals from the trial court's judgment that the '548 patent is invalid under 35 U.S.C. § 102(b) for being both on sale and in public use more than one year before the filing of the subject application and 35 U.S.C. § 103 for obviousness. Since the public use of the claimed invention more than one year before the filing date of the subject application is dispositive of the issue of validity, we find it necessary to discuss only this issue in affirming the trial court's decision on validity.

### I.

The use of three Hycor Rotostrainers using Johnson No. 60 wire screen cylinders in a sewage treatment plant and in two meat packing plants in 1972 and up to January 21, 1973, the critical date, is the basis for the public use issue under 35 U.S.C. § 102(b).

The trial court found that in 1972, Hycor provided two Rotostrainers to the North Chicago Sewage Treatment Plant, one using a screen cylinder with a diameter greater than 11 inches and having a Johnson No. 60 wedge wire screen and the other using a Johnson No. 69 wedge wire screen cylinder. The strainers remained at the plant until

1974. Yet, the trial court found and Welles admitted that no more than four to five days of testing was required to determine the effectiveness of Hycor's Rotostrainer in a commercial setting. No secrecy was imposed on any of the employees at the plant regarding use or testing.

The trial court also found that Hycor displayed photographs of the Rotostrainers at the North Chicago plant to representatives of Oscar Mayer & Co. and Packer Land Packing Co. in 1972 as part of Hycor's efforts to sell Rotostrainers.

The trial court found side by side testing of Rotostrainers had taken place at North Chicago in 1972, despite the fact that Welles testified that such testing did not occur until the spring of 1973 and that any testing in 1972 was by observation only. The 1972 tests were not documented or otherwise recorded by Welles. The court based its finding that testing took place in 1972 on the Welles affidavit submitted to the PTO, which said in part, "In 1972 we obtained and tested a unit like in Figures 9–14 with a number of screens or cylinders in two groups." The result of the controlled tests was that the Rotostrainer with a Johnson No. 60 wire screen cylinder significantly outperformed the one with a Johnson No. 69 wire screen cylinder. The court reasoned that Welles' memory was likely more precise in October, 1974, when he executed the affidavit, than when he testified in 1982. Also, Welles' affidavit was consistent with a January 10, 1973 letter to the South St. Paul Sewage Treatment Plant in which Welles wrote:

> Our findings at North Chicago roughly confirm your findings at St. Paul on the # 69 profile wire in that we appear to get some blinding over time in sanitary sewage, whereas with the # 60 profile wire we were able to run 40 days without any change in flow rate and without cleaning.

The trial court was unpersuaded by Welles' contrary testimony that the North Chicago tests were not conducted until 1973 or that testing continued to the spring of 1973, past the critical date.

The trial court also found that in the summer of 1972 Hycor sent two Rotostrainers to Iowa Beef Processors, one of which used a Johnson No. 60 wire screen cylinder, and one of which used a Johnson No. 69 wire screen cylinder. Also, in November, 1972, Hycor provided E. Kahn & Sons a Rotostrainer using a Johnson No. 60 wire screen cylinder for a 15-day pilot test with an eye toward Kahn's purchase of the apparatus. Welles testified the cylinder came apart in two days.

The trial court found that Hycor commercially exploited the invention in using the Rotostrainer: "The 1972 and early 1973 use of plaintiff's Rotostrainer by sewage treatment plants and food processors was intended to develop commercial demand for the Rotostrainer and to exploit its commercial value."

Hycor points to several errors of the trial court. Hycor argues that the burden was on Schlueter to establish a prima facie case of public use of the complete invention and that Hycor therefore should not have been required to show that the purpose of the uses was exclusively experimental. Hycor further argues the court improperly assessed the evidence of the various uses Hycor made of its Rotostrainers. Hycor contends the court should have found all the uses of the Rotostrainers experimental because, according to the Welles affidavit, successful testing was not completed until after the critical date.

## II.

This court has considered the public use bar under section 102(b)[5] before. *TP Laboratories, Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 220 USPQ 577 (Fed.Cir. 1984). We said in *TP Laboratories* that there is no separate "experimental use" exception, but rather, a single issue: Was there public use under section 102(b)? *Id.* at 971, 220 USPQ at 582. The issue must

be determined by considering the totality of circumstances. Factors to be considered in deciding whether there is a public use include, for example, the length of the test period, whether any payment has been made for the device, whether there is a secrecy obligation on the part of the user, whether progress records were kept, whether persons other than the inventor conducted the asserted experiments, how many tests were conducted, and how long the testing period was in relationship to tests of other similar devices. *Id.* at 971–72, 220 USPQ at 582.

Once a prima facie case of public use before the critical date has been made, the patent owner must come forward with clear and convincing evidence to counter that showing. *TP Laboratories,* 724 F.2d at 971, 720 USPQ at 582; *In re Dybel,* 524 F.2d 1393, 1401, 187 USPQ 593, 598 (CCPA 1975); *In re Blaisdell,* 242 F.2d 779, 784, 113 USPQ 289, 292–93 (CCPA 1957). Facts underlying the conclusion of public use are subject to the clearly erroneous standard.

The trial court's conclusion that there was public use of the claimed invention rests on its findings that Hycor, prior to the critical date, had commercially exploited the Rotostrainers having Johnson No. 60 wire screen cylinder, and had successfully demonstrated that the No. 60 wire screen cylinder outperformed the No. 69 wire screen cylinder.[6]

Photographs, taken by Welles and Hycor's vice president for marketing, of the Rotostrainers at the North Chicago plant were shown to representatives of prospective customers such as Oscar Mayer & Co. and Packer Land Packing Co. in order to obtain a sale. The record also discloses that no confidentiality obligations were imposed on any employees of the facilities which were using the Rotostrainer. The

**5.** 35 U.S.C. § 102(b) provides in pertinent part: A person shall be entitled to a patent unless—
    * * * * * *
(b) the invention was * * * in public use * * in this country, more than one year prior to the date of the application for patent in the United States.

**6.** Neither the testing of an invention on the commercial premises of another nor the fact that the owner of such premises, the inventor, or the public benefit from such testing alone create a public use bar. *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. (7 Otto) 126, 134–35, 24 L.Ed. 1000 (1877).

Rotostrainer was advertised and promoted in 1972 and sales literature was circulated freely. On cross examination, Welles admitted that he had told Packer Land that the Rotostrainer had been successfully tested at Iowa Beef and Oscar Mayer in the hope of generating a sale.[7] Nor was Welles able to point to any significant documentary evidence of testing.

The trial court evaluated the character of the uses at the North Chicago sewage treatment plant and the food processing and packing plants after reviewing the testimonial and documentary evidence. We are unable to say that the trial court's findings which underlie its conclusion are clearly erroneous. We conclude the record adequately supports those findings.

In view of this evidence, we also cannot agree with Hycor that Schlueter failed to establish a prima facie case of public use of the complete invention. Indeed, there is clear and convincing evidence of such barring use.

Hycor argues here that Welles had not successfully completed testing of a Rotostrainer using a No. 60 wire screen cylinder during 1972. While there might be some ambiguity as to the meaning of the Welles affidavit submitted to the PTO, ("in 1972 we obtained and tested"), the trial court concluded that Welles completed testing of the claimed invention in 1972. The Janu-

ary 10, 1973 letter to South St. Paul Sewage Treatment Plant is also ambiguous as to whether further experimental testing was to be undertaken.[8] Nevertheless, the trial court considered all the evidence relating to the uses and tests of the Rotostrainer with a No. 60 wire screen cylinder, the surrounding commercial activity, the testimony of Welles, and the affidavit submitted to the PTO. We conclude that the trial court's finding that Hycor successfully tested the Rotostrainer in 1972 was not clearly erroneous.

■ Finally, Hycor argues that the trial court improperly shifted the burden of proof by requiring it to show by clear and convincing evidence the exclusively experimental nature of its public use of Rotostrainers embodying the claimed invention in 1972 and early 1973. We disagree.

It is well settled that under 35 U.S.C. § 282 the ultimate burden of persuasion of patent invalidity rests solely with the party attacking validity. This court in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.1984) said:

> § 282 creates a presumption that a patent is valid and imposes the burden of proving invalidity on the attacker. That burden is constant and never changes ....

---

7. The following is an excerpt from the Welles' cross examination testimony at trial:

Q [Exhibit] 157 indicates that the unit has been successfully tested at Iowa Beef Processors and Oscar Mayer; is that correct?
A That's what it says.
Q And that was true at the time?
A Yes. It was successful.
Q And those tests were completed at that time, isn't that correct?
A I'm not saying they were completed. They were assumed to be successful as far as the customer was concerned. They were not successful as far as I was concerned.
Q You don't indicate in 157 that they weren't successful as far as you're concerned, do you?
A No. But that wouldn't be my prerogative.
*Q You indicated they were successful in the hope of generating a sale; isn't that correct?*
*A Yes.* [Emphasis added.]

8. The January 10, 1973 letter, quoted earlier, continues:

> Test results thus far indicate that we should rapidly move back to the # 60 wire to provide a faster breakaway for the water to drop through the cylinder and the solids to wash out. We are currently estimating that tooling and the production of two cylinders for the unit now at South St. Paul would run in excess of $10,000, assuming total feasibility, and deliveries would run from 10 to 12 weeks. Needless to day, [sic] we will want to give a lot of thought to this prior to moving ahead with the # 60 wire in 28⅝″ diameter.
> Your verbal outline of the testing program over the next two weeks sounds excellent, Keith, and I would very much like to be there myself when we change over to the sanitary sometime within the next three weeks, if this is contemplated.

The further testing referred to in the second quoted paragraph may, of course, indicate further testing of the feasibility of No. 60 wire in the South St. Paul facility.

See also *TP Laboratories*, 724 F.2d at 971, 220 USPQ at 582; *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1579, 219 USPQ 8, 11–12 (Fed.Cir.1983). The standard of proof of facts necessary to support a legal conclusion of invalidity is "clear and convincing." *Railroad Dynamics, Inc. v. A. Stucki Company*, 727 F.2d 1506, 1516, 220 USPQ 929, 938 (Fed.Cir.1984); *American Hoist*, 725 F.2d at 1360, 220 USPQ at 770.

The trial court did not shift to Hycor the burden of proving the validity of the '548 patent. Instead, the trial court correctly imposed on Hycor the burden of going forward with convincing evidence to counter Schlueter's prima facie showing of invalidating public use. As this court said in *TP Laboratories*, 724 F.2d at 971, 220 USPQ at 582:

> Thus, the court should * * * [look] at all of the evidence put forth by both parties and should * * * [decide] whether the entirety of the evidence led to the conclusion that there had been "public use." This does not mean, of course, that the challenger has the burden of proving that the use is not experimental. Nor does it mean that the patent owner is relieved of explanation. It means that if a prima facie case is made of public use, *the patent owner must come forward with convincing evidence to counter that showing.* [Emphasis added.]

Hycor failed to convincingly counter Schlueter's showing. Indeed, Schlueter has met its burden of "proving facts necessary to a conclusion of invalidity." *TP Laboratories*, 724 F.2d at 971, 220 USPQ at 582 (quoting *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d at 1579, 219 USPQ at 11–12).

The trial court considered the totality of circumstances. Hycor failed to put forward convincing evidence negating public use and failed to convince us of clear error in the trial court's findings. We therefore hold that the court correctly held the claimed invention was in public use under section 102(b).

## Attorney Fees

The trial court awarded attorney fees to Schlueter on the basis that Hycor was guilty of "extraordinary misconduct," based on its conclusion that Welles and his patent counsel committed fraud in the PTO. Another reason for the award was that the court found Welles commenced suit even though Welles "had good reason to know that [the '548 patent] was probably invalid and, therefore, not subject to infringement."

The trial court made the following findings of fact relating to lack of candor and fraud in the PTO.

> The Johnson catalog teaches the identical geometric configurations for a continuously helically wound wedge-shaped screen wire as called for in the claims of Welles '548, and the self-cleaning characteristics which are imparted by a cylindrical screen manufactured from wedge wire which serves to minimize the blinding or clogging of screen openings. From reading the Johnson catalog, a prospective customer would learn that Johnson screen products are designed for use in waste water treatment installations, in the food processing industry, and in other "dewatering" or straining applications. Also the customer would learn that the Johnson screens employed a continuous slot, or wedge wire, construction, rather than a round-hole or mesh design; that the wedge wire design decreased clogging or "blinding"; that the wedge wire configuration was adaptable to an outside to inside flow of liquid or to a reverse flow from inside to outside; and that the screens could be used in a rotating situation as well as in a fixed position.

> Further, as an aid to the customer in choosing the most effective surface profile and support rod spacing for the particular installation, the Johnson catalog featured a chart plotting the relationship of spatial opening between adjacent wires to the open area on the screen surface. The chart shows that, at a spacing of .060 inches, the use of no. 60

wire will result in 50% of the screen's surface being open, while use of no. 69 wire with the same spacing will reduce the open area to about 47–48%. The catalog shows twelve different configurations of wedge wire, two of which have included angles of 26 degrees or greater (the No. 60 and the No. 90) and two of which show included angles of 18 degrees (the No. 69 and the No. 190). In reality, the included angle of the No. 69 wire is about 14 degrees; the 9 degree one-sided angle shown in the catalog is erroneous. * * *.

The catalog shows that Johnson screens could be fabricated as flat panels of any shape, or in conical or cylindrical shapes; it shows also that Johnson screens have been used as centrifuge baskets and as vertical spin driers.

Welles never advised the Patent Office of the Johnson catalog.

Regarding intent, the trial court found: [F]raud can be inferred from the failure of Welles or his patent counsel to cite the Johnson catalog or to advise the patent office of the source of the wedge wire screens (or the source of the drawings used for figure 12 of the continuation-in-part application).

With regard to Hycor's various public use and on sale activities the trial court found:

Plaintiff knew or should have known of the high degree of relevance of the Johnson catalog and its own on-sale activities as prior art. When plaintiff filed this lawsuit, it was aware of the possible invalidity of its patent and of the legal consequences of asserting such a patent.

The trial court concluded that:

Welles and his patent counsel did breach their duty of candor to the patent office; that the information withheld (the Johnson catalog and the 1972 and early 1973 installations and sale of the No. 60 Rotostrainer) would have been considered important by a competent patent examiner in deciding whether to issue a patent on the Rotostrainer; and that Welles's breach of his affirmative duty to bring the withheld information to the attention

of the examiner destroys any presumption of validity to which the patent would otherwise be entitled and renders the Welles '548 patent unenforceable.

In another section of the opinion, the trial court separately concluded, "Welles's failure to cite the Johnson catalog and the public use of the Rotostrainer prior to January 21, 1973, was material and intentional and constitutes fraud on the patent office, rendering invalid the Welles '548 patent."

■ An applicant for a patent is under a duty of candor in dealing with the PTO. One of our predecessor courts analyzed the relationship of trust that must exist between the PTO and those wishing to receive patent protection for inventions. The court said, "[t]he highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far to say they are essential." *Norton v. Curtiss,* 433 F.2d 779, 794, 167 USPQ 532, 544 (CCPA 1970).

■ A breach of the duty of candor owed to the PTO, that prevents the grant of a patent or causes it to be held invalid or unenforceable, occurs when material information is misrepresented or withheld, and such misrepresentation or withholding is intentional or accompanied by gross negligence or bad faith. Our review of the trial court's findings of fact and conclusions of law focuses on whether this case presents exceptional circumstances under 35 U.S.C. § 285. That is, did Welles and his patent counsel by breaching their duty of candor to the PTO by fraud, bad faith, or gross negligence, meet the "exceptional" case requirement.

■ Fraud must be proved by clear and convincing evidence. *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 217 USPQ 1281 (Fed.Cir.1983); *Norton,* 433 F.2d at 797, 167 USPQ at 546–47; *See* Miller, *Fraud on the PTO,* 58 JPOS 271 (1976). Further, "an applicant's misrepresentation or failure to meet his 'duty to disclose to the Office

information * * * which is material' will not in itself render a patent invalid or unenforceable, *see* 37 CFR 1.56(a) and (d)," *American Hoist,* 725 F.2d at 1364, 220 USPQ at 774.

A finding of fraud may be determined only by a careful balancing of intent in light of materiality. As this court recently said in *American Hoist:*

> Questions of "materiality" and "culpability" are often interrelated and intertwined, so that a lesser showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of withheld information would necessarily create an inference that its non-disclosure was "wrongful."

725 F.2d at 1363, 220 USPQ at 774 (citing *Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 716, 210 USPQ 521, 538 (1st Cir. 1981)).

The trial court in this case tracked one of the several standards of materiality, PTO Rule 56(a),[9] in concluding that the failure of Welles and his patent counsel to disclose the Johnson catalog to the PTO was a breach of the duty of candor. The trial court determined that the Johnson catalog was the most relevant information for the examiner because the catalog disclosed the screen cylinders which Welles used in his comparative testing. It was with these tests that Welles showed that one screen cylinder significantly outperformed another screen cylinder. The court also said the examiner would have found highly relevant the fact that Welles only worked with two or three possibilities from a universe of the twelve Johnson wedge wire screen profiles shown in the catalog.

The trial court also looked to the "Remarks" submitted by Welles during prosecution. In the "Remarks" Welles said that the invention described by one piece of prior art (Hawley, U.S. Patent No. 2,294,179) would be unsatisfactory because the screening medium would clog immediately, and that the invention described by another piece of prior art (Cook, U.S. Patent No. 828,715) which had longitudinal wedges rather than circumferential wedges, would not allow effective cascading action. Welles did not contest the combinability of the references.

The trial court said that the affidavit's reference to Johnson as "our source" influenced the examiner's decision to allow the application, and that Hycor's argument that Johnson would not show which wedge wire configurations worked best was "disingenuous." The trial court further said that if Johnson had been cited, "the examiner would have realized not only that the wedge wire configuration used by Welles was prior art, but that it was obvious for Welles or anyone else to try more than one of the Johnson configurations to obtain a better cleaning effect than Hawley had been able to achieve."

The only relevant testimony of Welles on the question of materiality is that he supplied the catalog to counsel at the time the application was prepared, and that he did not know of any better reference to show the wedge wire shape. Since the only other evidence of whether the examiner would have considered the Johnson catalog important to his decision to allow the application is the prosecution history,[10] we must look to it for guidance.

The prosecution history shows the examiner was aware that the screen cylinders were standard items and that the two Rotostrainers which were tested used two of these standard items which were very similar to each other in terms of included angles and radial dimensions. All nine of the claims substituted by amendment were allowed. Therefore, the trial court's findings on materiality are clearly erroneous. What is clear from the file history is that the examiner would not have considered

---

9. [I]nformation is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent * * *. 37 CFR 1.56(a), third sentence (1983).

10. The examiner was neither called to testify at the trial nor deposed.

the catalog important in light of the test results.

Other information not disclosed to the PTO, which the trial court also concluded was material concerned the 1972 and early 1973 uses and sales of Rotostrainers using either No. 60 or No. 69 wire. The prosecution history is devoid, however, of any evidence of these uses other than the testing use recited in the Welles affidavit. We conclude that the trial court's finding, that these uses and sales would have been considered important to a reasonable examiner is not clearly erroneous, especially in view of our invalidity holding based on the public use of the Rotostrainer.[11]

We now turn our attention to the intent element which is a requisite in determining the existence of fraud. *Norton*, 433 F.2d at 795, 167 USPQ at 545. Direct evidence of wrongful intent is not required. As this court said in *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151, 219 USPQ 857, 861 (Fed.Cir.1983): "The duty of candor owed the PTO being uncompromising, it would deal a deathblow to that duty if direct proof of wrongful intent were required." On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith is not sufficient to satisfy the intent element. Aside from direct evidence of wrongful intent— i.e., deliberate scheming—intent may be proven by a showing of acts the natural consequences of which are presumably intended by the actor. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d at 1151, 219 USPQ at 862; *American Hoist*, 725 F.2d at 1363, 220 USPQ at 773. The lower threshold for finding intent is therefore satisfied by evidence of gross negligence. *Id.* That threshold was not breached in the present case.

The trial court said, "there [cannot] be any question of Welles' intent to withhold the information from the patent office. The careful omission of any reference to Johnson and the misleading nature of the 'Remarks' submitted to the patent office

allow no other conclusion." After reviewing the record, we conclude that the trial court's finding that the intent requisite to a conclusion of fraud could be inferred from failure to cite the Johnson catalog is clearly erroneous. The conclusion of the trial court that the withholding of the information in question was made through fraud is also erroneous as a matter of law because there is no support for it in the evidence of record.

On the issue of intent as to the pre-critical date uses, the trial court said failure to advise the PTO of the 1972 and early 1973 sales and installations of the Rotostrainer was deliberate since it was information peculiarly within Welles' knowledge. While we agree that the information about sales and installations should have been disclosed, see note 11 supra, failure to provide such information in this case amounts to an honest mistake in judgment insufficient to establish intent.

Although the actions of Welles and his patent counsel taken in the prosecution of the patent application that issued as the '548 patent should have been different, the evidence of record shows Welles and his counsel are guilty of no more than simple negligence or a good faith error of judgment. Because the requisite intent is lacking here, we hold there is no clear and convincing evidence of fraud on the part of Welles and his patent counsel.

A finding of exceptional circumstances is required before a trial court can exercise its discretion to award reasonable attorney fees under 35 U.S.C. § 285. *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 712–13, 218 USPQ 969, 975–76 (Fed.Cir.1983). An award of attorney fees is reviewed under the abuse of discretion standard, and an award must be set aside if it is unsupported by adequate findings of the basis for the award. *Hughes v. Novi American, Inc.*, 724 F.2d 122, 124, 220 USPQ 707, 709 (Fed.Cir.1984).

**11.** Another related problem, not discussed by the trial court, involves falsification of the inventor's oath. That oath, among other things, requires an applicant to state that he does not know of public uses or sales of the invention made more than a year prior to the application.

The trial court awarded attorney fees in this case because Welles committed fraud in the PTO and because when suit was commenced, Welles had good reason to know that the '548 patent was probably invalid. In view of our foregoing conclusion that there was no fraud in the PTO, and because there is no evidence in the record that Welles probably knew the '548 patent was invalid, the trial court's finding that this case is exceptional is clearly erroneous. The trial court therefore abused its discretion by awarding attorney fees to Schlueter, and accordingly, we reverse that portion of the trial court's decision.