**MICRO MOTION, INCORPORATED, Plaintiff,**

v.

**EXAC CORPORATION, Defendant.**

**No. C–84–20681–SW.**

United States District Court, N.D. California, San Jose Division.

Nov. 3, 1987.

Charles H. Brock, Hoge, Fenton, Jones & Appel, Inc., San Jose, Cal., John O. Tramontine, Jesse J. Jenner, David J. Lee, Fish & Neave, New York City, Mary Helen Sears, Ginsburg, Feldman & Bress, Washington, D.C., for plaintiff.

Claude A.S. Hamrick, Rosenblum, Parish & Bacigalupi, San Jose, Cal., Sheldon W. Witcoff, Seymour Rothstein, Daniel A. Boehnen, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PATENT ENFORCEABILITY

SPENCER WILLIAMS, District Judge.

### I. BACKGROUND

1. This is an action for patent infringement in which the issues were trifurcated for separate trials of enforceability to the Court, and thereafter infringement and damages to a jury.

2. The enforceability issues to be tried related to Exac's charges that Micro Motion's conduct in obtaining the '450 Patent [Reissue Patent No. 31,450] and the '025 Patent [4,491,025] was inequitable because (a) during prosecution of the patent applications which led to the '450 Patent, the applicant mischaracterized and failed accurately to describe Sipin patent 3,485,098, and (b) that during prosecution of the patent application for the '025 Patent the applicants improperly failed to call the Examiner's attention to Cushing Patent 3,251,226.

3. Both parties agreed that inequitable conduct charges raised by Exac be tried first to the Court because, if those charges were sustained, and both patents declared unenforceable, there would be no further proceedings. Compare *Gardco Manufacturing Co. v. Herst Lighting Co., et al.,* 820 F.2d 1209 (Fed.Cir.1987).

4. Trial of the two inequitable conduct charges concluded on June 30, 1987, with a ruling that Exac had not proven either of its two inequitable conduct charges by clear and convincing evidence (Tr. 805–806).

### II. FINDINGS OF FACT

5. The two patents in suit relate to meters for measuring the mass flow rate of fluids in which conduits oscillating about an axis are deflected by Coriolis force effects as fluid moves through the conduit.

A. *The Enforceability of the '450 Patent*

6. The '450 Patent generally relates to Coriolis mass flowmeters in which the oscillating conduit, depicted as a "U"-shaped conduit, is free of pressure-sensitive joints and rigidly mounted in a cantilevered fashion at its inlet and outlet so that under flow conditions the Coriolis forces—acting against the spring forces of the resilient conduit—cause the conduit to deflect so that one side of the conduit leads and the other side trails. (DX 1, PX 227, Tr. 448–468, 472–474).

7. The '450 Patent is a Reissue of United States Patent No. 4,187,721 (the " '721 Patent") (DX 4). The '721 Patent issued February 12, 1980 on an application filed July 20, 1978 (DX 6) as a continuation-in-part of an application filed on July 25, 1977 (DX 5). The reissue application for the '450 Patent was filed on February 11, 1982 (DX 7).

8. The specification of the original application for the '721 Patent includes a section (carried through succeeding applications into the '721 and '450 Patents) entitled "Description of the Prior Art" which discusses Sipin patent 3,485,098 (the "Sipin '098 patent"). (DX 1, DX 4–7, DX 16).

9. In his first Office Action on the original application for the '721 Patent, the Patent Examiner rejected or objected to all pending claims. All three of his rejections on prior art cited Sipin '098 as the only or principal prior art reference (DX 5).

10. In response to this rejection, applicant's attorney amended the four independent claims which had been rejected and added three more independent claims, and made the following remarks with respect to the Sipin '098 reference:

"Applicant's attorney wishes to thank the Examiner for the time afforded for an interview. While no specific agreements were reached during the interview, several points of importance were discussed and communications as to the nature of the rejection were greatly improved. For instance, the Examiner made the point—which is well taken by applicant—that the 'U' shaped conduit as defined in the previously submitted claims is readable upon conduit sections which are articulated, i.e., include joints, swivels, bellows, etc. Such articulations are found, for instance, in the Sipin refer-

ence at, for instance, bearings 12 and 13 of FIGURES 2 and 4, bellows 78 and 79 of FIGURE 8, and ports 54 and 55 of FIGURES 6 and 7. By definition, such articulations are devices inserted in the conduit which permit ready movement of the conduit relative to the conduit support. However, such articulations are invariably pressure sensitive and accordingly require enclosures, as in FIGURE 4 of Sipin, to equalize pressure on the interior and exterior of the conduit (a difficult condition to maintain under high pressures because of the great area of the enclosure) and the accompanying complications.

Accordingly, claims 1, 2, 13, 16, 17, 19, 22, 23, and 24 which have been rejected under 35 U.S.C. 103 as obvious in view of the teachings of Sipin, have been amended to recite the true nature of applicant's 'U' shaped conduit. Specifically, applicant's conduit is a continuous, nonarticulated member mounted at one end, i.e., cantilevered, and extending in any direction. By providing a 'U' shaped conduit in the form of a nonarticulated member, i.e., without joints, slip bearings, bellows, or other such prior art articulations, applicant's nonarticulated, jointless conduit is not subject to pressure influences of substantially greater magnitude than those which seriously compromise the results obtainable with articulated conduits. The significance of the nonarticulated, jointless conduit is set forth at page 7, lines 15 through 18 of the specification.

Rather than accommodating movement of the conduit by means of articulations such as bellows, etc., applicant accommodates both oscillation of the 'U' shaped conduit to induce Coriolis forces, and movement as a result of the Coriolis forces, by means of elastic distortion of the spring-like, nonarticulated 'U' shaped conduit. This simple feature, which is now delineated in claims 1, 2, 13, 16, 17, 19, 22, 23 and 24, either directly or by dependence upon a claim incorporating the limitations, provides for a simplified mass flow metering device having greatly diminished susceptibility to flow measurement errors resulting from flowing a pressurized material through the conduit. Clearly Sipin discloses only an articulated conduit and accordingly in no way suggests applicant's device." (DX 5)

11. Following this response, the Patent Examiner allowed all claims. (DX 5).

12. Exac's unenforceability charge against the '450 Patent is that during prosecution of the applications leading to that patent there was a "mischaracterization of and failure to accurately describe the Sipin '098 patent" (Pretrial Order No. 1, p. 2). Exac accuses Micro Motion of making a false statement and thus engaging in conduct which "constitutes, at the very minimum, gross negligence". Exac also accuses Micro Motion of inequitable conduct because, during the prosecution of the '450 Reissue application (when the term "nonarticulated" appearing in some of the claims was replaced with the phrase "free of pressure sensitive joints") Micro Motion "failed to correct" the record in the Patent Office. (Exac Brief, June 19, 1987, pp. 14, 17, 20, 21).

13. The Sipin '098 patent (DX 16) discloses Coriolis force mass flowmeters having flow tubes of various configurations. One configuration (Figs. 8 and 9) uses bellows connections at the ends of a tube of complex shape. Another configuration (Figs. 2 and 4) uses a curved tube, made of "relatively rigid" material, whose ends are mounted in "flexible" rings which "Typically ... are made of rubber or a similar material". A third configuration (Fig. 6) uses a curved tube which itself is made of "relatively flexible" material. Each of these tube configurations is mounted within a "chamber" capable of pressurization. Sipin also discloses (Fig. 1) a diagram of a U-shaped conduit section which he uses for a theoretical analysis of the Coriolis forces involved in various motions of that schematic conduit section. (DX 16, Tr. 473–491, 518–521, 592–593).

14. The Figure 6 configuration of the Sipin '098 patent is the focus of Exac's inequitable conduct charge against the '450 Patent. Exac contends that when Micro

Motion told the Patent Examiner that Sipin '098 disclosed "only an articulated conduit," that statement was false and deceived the Examiner into allowing the claims over Sipin '098. According to Exac, Sipin's Figure 6 configuration was a "non-articulated" conduit, "free of pressure sensitive joints," like that disclosed and claimed in the original application and the '450 Patent.

15. The Patent Examiner did not take issue with the attorney's summary of their interview. His attention was originally called to Sipin '098 by the discussion of it in the "Description of the Prior Art" in the patent application. His use of and detailed comments regarding Sipin '098 (including Figure 6) in his rejections demonstrate that he had read it carefully. The Examiner was entirely free and competent to reach his own conclusions if he differed with the conclusions of the applicant's attorney. (DX 5, Tr. 203, 223–224, 588–589, 593–595, 615–617, 625–626; see also Tr. 216–222, 473–495, 518–535, 596–600).

16. When, almost four years later, the reissue application for the '450 Patent was filed by another attorney, the Patent Office's attention was again drawn to Sipin '098 as a prior art reference. Sipin '098 was discussed in the specification's "Description of the Prior Art," and was also cited and discussed in a lengthy Prior Art Statement filed with the reissue application. It can be assumed that the Examiner made the required thorough study of the Sipin '098 Patent (37 C.F.R. § 1.104), and was in as good a position as the applicant to reach his own conclusion if he differed with the attorney's conclusions regarding it. (DX 7, Tr. 214–216, 488–489, 531–534, 595–601, 625–627; see also DX 55, DX 341, Tr. 340–354, 604–611, 614–615).

■ 17. Exac failed to prove that anyone substantively connected with the preparation or prosecution of any of the applications leading to Micro Motion's '450 patent believed that any statement made to the Patent Office with respect to Sipin '098 was false or misleading or was guilty of gross negligence.

18. There is no clear and convincing proof, that during the prosecution of the applications leading to the '450 Patent, the Sipin '098 reference was wrongly characterized.

B. *The Enforceability Of The '025 Patent*

19. The '025 Patent in suit generally relates to an improvement on the Coriolis mass flowmeters of the '450 Patent in which the fluid flowing into the flowmeter is divided into two hydraulically parallel flow paths through side-by-side conduits oscillating in a tuning fork arrangement. (DX 3, Tr. 495–496, 515).

20. The '025 Patent issued on an application filed on November 3, 1982. Shortly thereafter, the applicant's attorney filed a Prior Art Statement discussing some 15 prior art references, copies of which were provided to the Patent Examiner. Several of these references were also discussed in the "Background of the Invention" section of the application. All claims were allowed over the prior art in the Patent Examiner's first Office Action. (DX 8).

21. Among the prior art references discussed in the application and in the Prior Art Statement was Cox et al. patent 4,127,-028 (the "Cox '028 patent). The Cox '028 patent discloses a Coriolis mass flowmeter of the oscillating cantilevered conduit type using two spaced-apart U-shaped flow tubes in a tuning fork arrangement. The fluid flow through the two tubes of Cox '028 is in series, not in parallel. (DX 8, DX 43).

22. The Prior Art Statement brought to the Examiner's attention that although the Cox '028 patent did not show hydraulically parallel flow paths, other prior art references did. Discussed at length was Brockhaus patent 3,456,491 (PX 243), also noted in the application, which disclosed a meter for measuring fluid density with hydraulically parallel flow paths in two cantilevered members mounted in a tuning fork arrangement and oscillated by an electromagnet. The Prior Art Statement also discussed at length portions of a treatise by Katys, "Continuous Measurement of Un-

steady Flow," with emphasis on pages 45–51 (PX 241) and its disclosure of a Coriolis force mass flowmeter of different design having hydraulically parallel flow paths. Exac's counsel conceded Katys and Brockhaus show parallel flow structures. (DX 8, PX 241, PX 242, PX 243, Tr. 155–156, 253–264, 372, 502, 510, 557–559, 618).

23. Exac's unenforceability charge against the '025 Patent is that Micro Motion was guilty of inequitable conduct for "failure to disclose the Cushing '226 patent ... to the Patent Office during prosecution of the patent application leading to the '025 patent" (Pretrial Order No. 1, p. 2).

24. Cushing patent 3,251,226 (the "Cushing '226 patent") (DX 41) discloses mass flow and density meters using narrowed, or "Venturi", pipe sections, and making differential pressure measurements as the Venturi sections are reciprocated in the direction of the flow path. Arrangements of such sections are shown singly, in series and in parallel. (DX 41, 497–499).

25. Exac contends that Cushing '226 teaches the equivalence of hydraulically serial and parallel flow in a flowmeter. Further, Exac contends that this teaching would make it obvious to one skilled in the art to change the hydraulically serial flow path of the twin tubes in Cox '028 to a hydraulically parallel flow path and thus reach the invention of the '025 Patent. Exac asserts that Micro Motion was guilty of inequitable conduct for not calling the Examiner's attention to Cushing '226 and its teaching that flow through a meter could be in series or in parallel.

26. The thought of series and parallel paths as alternates is a basic concept in fluid flow, learned early in school, known to plumbers and engineers alike, one alternate being thought of automatically by a skilled person when the other is mentioned. The Patent Examiner who examined the application for the '025 Patent had 20 years experience examining applications in the flowmeter art, and certainly would have known this. (DX 8, DX 16, PX 238–240, Tr. 247–252, 499–500, 511–513).

27. Exac contends that the Micro Motion awareness of the pertinency of Cushing '226 to the examination of the application for the '025 Patent is established by the fact that Cushing '226 was cited in the Prior Art Statement filed during the examination of the reissue application for the '450 Patent. But, even apart from the different inventive concepts of the '450 and '025 Patents, the record shows that the Cushing patent appeared in the '450 Prior Art Statement, without comment simply because it was one of a very large number of references which Micro Motion's attorney automatically called to the attention of the Patent Office during the '450 reissue prosecution. Those references had previously been cited to the Patent Office by Halliburton during its prosecution of an application to reissue the Cox '028 patent, which reissue proceedings were protested by Micro Motion, who also was in litigation with Halliburton over ownership of Cox '028. Under the circumstances, there is no reason to believe that the applicant or his attorney actually considered Cushing '226 important to the patentability of the '450 Patent claims. More importantly, no inference is warranted that would impute to either '025 applicants or their attorney who prosecuted the '025 Patent any recognition that Cushing '226 was pertinent to the '025 prosecution or that a reasonable Examiner would consider it important. (DX 7, PX 253, PX 255–259, Tr. 500–502, 563–583, 622–623, 627–628).

28. Exac seeks to establish inequitable conduct during the prosecution of the '025 application by reliance on the fact that on April 14, 1987 the Patent Examiner involved in that prosecution granted, at Exac's request, reexamination of the '025 Patent. The Examiner's grant of reexamination made the statement that consideration of various prior art documents cited by Exac "raises a substantial new question of patentability" regarding the '025 claims and that the prior art combinations presented by the request, including the Cox '028 patent in view of Cushing '226, "is clearly material to the examination of said claims since each combination includes the essential 'hydraulically parallel flow paths' fea-

ture claimed". Under the Rules of Practice of the Patent Office, where, as here, the request for reexamination is made by one other than the patent owner, "no statement or other response by the patent owner shall be filed prior to the determination [of 'whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request']". (37 C.F.R. § 1.530). Thus, the Patent Examiner granted reexamination of the '025 Patent solely on the basis of the submission and arguments by Exac, with Micro Motion prohibited from being heard. (DX 9, DX 10).

■ 29. Cushing '226 showed the use of hydraulically parallel flow paths, as did the '025 Patent, but there the resemblance ended. The Cushing meter was a straight flow, differential pressure Venturi flowmeter, not a Coriolis flowmeter. It did not involve oscillation of a conduit about an axis. It did not involve measurement of force reactions on a conduit. It did not involve a change of direction of the fluid. Exac's patent expert, Mr. Frost, admitted that Cushing '226 would have been more pertinent if it had those features. Yet Mr. Frost admitted that the Katys reference (PX 241), which was before the Examiner, disclosed a hydraulically parallel flow path in a Coriolis force meter with oscillation of a conduit about an axis, a change of direction of the fluid and measurement of force. Cushing '226 does not disclose hydraulically parallel flow paths arranged in a tuning fork arrangement as in the '025 Patent. But the Brockhaus patent, which was before the Examiner, had such a disclosure. Thus, Katys and Brockhaus had disclosures, including "the essential 'hydraulically parallel flow paths' feature claimed" noted in the Examiner's grant of reexamination, that made them more pertinent than Cushing to the Patent Office examination of the application for the '025 Patent and they were both cited to the Patent Office and discussed by Micro Motion's attorney. (DX 3, DX 8, DX 41, PX 237, PX 241, PX 242, PX 243, Tr. 155–156, 172–173, 253–264, 500–502, 510, 557–563, 601–602, 627–630; see also Tr. 241–246, 498–499, 512–517, 545–546).

30. There is no clear and convincing proof, that during the prosecution of the application for the '025 Patent the Cushing '226 patent was improperly withheld, or that anyone substantively connected with the preparation or prosecution of that application had any intent to deceive or was guilty of gross negligence in not calling Cushing '226 to the attention of the Patent Examiner.

## III. CONCLUSIONS OF LAW

■ 1. Applicants for patents have a duty of candor and good faith in their dealings with the Patent Office. This means that applicants for patents and their attorneys must not knowingly or through gross negligence misrepresent or fail to disclose "material" information concerning the invention. A breach of this duty of candor and good faith is inequitable conduct, and a Court will refuse to enforce any patent obtained by inequitable conduct.

■ 2. To prove inequitable conduct, Exac had to show by clear and convincing evidence that the information it contends was misrepresented or withheld was both material and misrepresented or withheld intentionally or through gross negligence. See, e.g., *Allen Archery Inc. v. Browning Mfg. Co.,* 819 F.2d 1087, 2 USPQ2d 1490, 1495 (Fed.Cir.1987); *Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471, 1481 (Fed.Cir.1986), cert. denied —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir.1984).

■ 3. Materiality and intent must be considered together to determine if there was inequitable conduct. Where the information misrepresented or not disclosed has a lower degree of materiality, a higher degree of intent is required for a finding of inequitable conduct and vice versa. See, e.g., *Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471, 1481–82 (Fed.Cir. 1986), cert. denied —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1362–63 (Fed.Cir.1984), cert. de-

nied 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

█ 4. The Courts have generally recognized four levels of materiality:

1.  To be considered "material" in any sense, the misrepresented or undisclosed information must be at least such that "there is a substantial likelihood that a reasonable examiner would consider [it] important in deciding whether to allow the application to issue". This "threshold" materiality standard is set forth in Patent Office Rule 56.

2.  The misrepresented or undisclosed information is more material if awareness of it "might reasonably have affected the examiner's decision" to issue the patent. This has been referred to as the "but it may have" level of materiality.

3.  The misrepresented or undisclosed information is yet more material if the particular Examiner in question would have rejected the patent claims if he had known of that information, even though the claims were in fact patentable. This has been referred to as the subjective "but for" level of materiality.

4.  The misrepresented or undisclosed information is most material if it does in fact render the claims unpatentable. This has been referred to as the objective "but for" level of materiality.

See, e.g., *Litton Indus. Products, Inc. v. Solid State Systems*, 755 F.2d 158, 166 (Fed.Cir.1985); *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1362–63 (Fed.Cir.1984), cert. denied 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Other similar stations along the continuum of materiality have been formulated. See, e.g., *Mannesmann Demag v. Engineered Metal Products*, 605 F.Supp. 1362, 1381–82 (D.Del.1985), affirmed 793 F.2d 1279 (Fed. Cir.1986); *Austin Powder Co. v. Atlas Powder Co.*, 593 F.Supp. 208, 212 (D.Del. 1984).

█ 5. Intent also has degrees of culpability, the Courts noting that omission or misstatement of material information can be the result of a deliberate intent to mislead or can be unintentional. Where the omission or misstatement is unintentional, simple negligence, oversight or an erroneous judgment is insufficient to constitute inequitable conduct even where the withheld or misrepresented information is highly material. A finding of gross negligence will warrant a holding of inequitable conduct if the undisclosed or misstated information meets the objective "but for" test of materiality and the actor should have known this, gross negligence requiring proof of willful, wanton or reckless misconduct or utter lack of all care. See, e.g., *N.V. Akzo v. E.I. duPont de Nemours*, 810 F.2d 1148 (Fed.Cir.1987); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 785 F.2d 292, 294–95 (Fed.Cir.1986), cert. denied 479 U.S. 820, 107 S.Ct. 85, 93 L.Ed.2d 39 (1986); *Machinery Corp. Of America v. Gullfiber AB*, 774 F.2d 467, 473 (Fed.Cir.1985); *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559–60 (Fed.Cir.1984), cert. denied 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed. 2d 60 (1985); *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1540 (Fed.Cir.1984); *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383 (Fed.Cir. 1983).

█ 6. Information does not meet even the threshold level of requisite materiality if it is merely cumulative, that is, if it is less pertinent than, and adds nothing to, what is already known to the Examiner. See, e.g., *Litton Indus. Products, Inc. v. Solid State Systems*, 755 F.2d 158, 167 (Fed.Cir.1985); *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559–60 (Fed.Cir.1984), cert. denied 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *Kimberly Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1455–56 (Fed.Cir.1984). Also, where a reference is called to the Patent Examiner's attention and discussed, an incorrect characterization of that reference by the applicant, even if in a material respect, or a failure to correct a material characterization later discovered to be incorrect, should not, in the absence of clear and convincing proof of deliberate intent to

deceive, constitute inequitable conduct where the Examiner was free and competent to reach his own conclusion regarding the disclosure in the reference before him. See, e.g., *Akzo N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1481–82 (Fed.Cir. 1986), cert. denied —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).

7. Exac had the burden of proving inequitable conduct by clear and convincing evidence, both as to materiality and intent. Exac has not met that burden with respect to either its inequitable conduct charge against the '450 Patent or its inequitable conduct charge against the '025 Patent.